# EXHIBIT A

**SUFFOLK, ss.**

# Commonwealth of Massachusetts



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. ___13-2043___

EMC Corporation _____, Plaintiff(s)

v.

Jonathan Tanner _____, Defendant(s)

## SUMMONS AND ORDER OF NOTICE

To the above-named Defendant:    EMC Corporation

You are hereby summoned and required to serve upon__Choate Hall & Stewart LLP___

plaintiff's attorney, whose address is___2 International Pl Boston, MA. 02110___,

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WE ALSO NOTIFY YOU that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Boston of our said court on__Monday__ CTRM 304 _the__ 10th__ day of__June__A.D. 201_3_, at ____Two____ o'clock A.M., at which time you may
PM
appear and show cause why such application should not be granted.

Witness, Barbara J. Rouse, Esquire, at Boston, the ____Fourth____day of
____June____, in the year of our Lord two thousand _and Thirteen_

_____
Asst. **Clerk/Magistrate**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM CIV.P.2 1M 11/2011

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _____,201____, I served a copy of the within summons and order of notice, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:_____, . 201 ____.            _____

 

**N.B.**   **TO PROCESS SERVER:—**
PLEASE PLACE **DATE** YOU MAKE SERVICE ON DEFENDANT IN
THIS BOX **ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

```
┌──────────────────────────────────┐
│                        , 201  .   │
└──────────────────────────────────┘
```

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. _____, Plff(s).

v.

_____, Deft(s).

**SUMMONS**
**(Mass. R. Civ. P. 4)**
**AND**
**ORDER OF NOTICE**
**ON**
**APPLICATION FOR PRELIMINARY**
**INJUNCTION**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                              SUPERIOR COURT

|  |  |
|---|---|
| EMC CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JONATHAN TANNER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

CIVIL ACTION NO. _____

## VERIFIED COMPLAINT

Plaintiff EMC Corporation ("EMC") files this Verified Complaint for declaratory and preliminary and permanent injunctive relief and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action based on the wrongful conduct of Jonathan Tanner ("Tanner"), who was a highly-compensated EMC sales representative previously responsible for selling EMC products and services to key strategic customers. During his final years at EMC, Tanner consistently ranked among the top five performers at his position in his region and among the top sales representatives in the entire United States.

2.      Tanner is a party to a Key Employee Agreement ("KEA") with EMC. Pursuant to his KEA, Tanner has ongoing contractual obligations to EMC, including (a) not to use, divulge or disclose to persons outside of EMC its confidential and proprietary business information not available to the public concerning EMC and its customers ("Confidential Information"), and (b) not to, directly or indirectly, solicit business from any EMC customer or potential customer about which Tanner had knowledge during his employment with EMC. This action seeks to

require Tanner to honor his obligations to EMC for the full contractual term of his KEA – ending December 21, 2013 – and to refrain from unlawfully soliciting EMC customers and potential customers on behalf of Tanner's new employer, Pure Storage, Inc. ("Pure Storage").   Pure Storage is a direct competitor of EMC in the enterprise storage market.

3.      While at EMC, Tanner was responsible for selling EMC's entire suite of products, including enterprise storage and backup and recovery products, to several of EMC's key customers.  In his new position at Pure Storage, Tanner is responsible for selling Pure Storage's directly competing products to certain of these very same customers and to the same overall class of customers.

4.      EMC learned recently that Tanner is violating his KEA with EMC by unlawfully soliciting EMC's customers – the very same customers he was responsible for selling to while employed by EMC – on behalf of his new employer, Pure Storage.  This action seeks to enjoin Tanner's unlawful conduct in order to protect EMC's legitimate business interests, including its confidential information and goodwill in the marketplace, and to prevent EMC from suffering additional, irreparable harm.

5.      In limited instances where indicated, allegations in this Verified Complaint are based upon information and belief.  Such allegations stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## PARTIES

6.      Plaintiff EMC is a Massachusetts corporation with its principal place of business in Hopkinton, Massachusetts, and other offices located in Boston, Massachusetts.

7.      Upon information and belief, Defendant Tanner is a resident of Chicago, Illinois. Tanner is bound by his KEA, which is expressly governed by Massachusetts law, and in which he expressly consented to personal jurisdiction in Massachusetts. Ex. A, ¶ 7(h).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendant Tanner pursuant to Mass. Gen. Laws Ch. 223A, § 3 because (a) he transacted business and contracted with his former employer, EMC, in this Commonwealth on matters directly related to the current dispute, (b) his actions complained of herein are causing injury to EMC in this Commonwealth, and/or (c) he expressly consented to personal jurisdiction in Massachusetts courts in his KEA. Ex. A, ¶ 7(h).

9.      Venue is appropriate in this county pursuant to Mass. Gen. Laws Ch. 223, § 8, as EMC maintains a usual place of business in, and may sue and be sued in, Suffolk County.

## FACTUAL BACKGROUND

### *EMC is in a Highly Competitive Industry*

10.     EMC is one of the leading technology companies in the United States.  EMC is engaged in, among other things, the business of designing, manufacturing and selling technologies and information storage systems in the area of managing information in complex technical environments.

11.     EMC competes with many companies in the markets that it serves, and its products have achieved broad market acceptance due in large part to their technical superiority to competing offerings and the team of skilled sales professionals and consultants at EMC who effectively market and sell these products to EMC's customers.  In order to maintain this competitive advantage, EMC expends substantial resources to safeguard and protect its

3

Confidential Information and to develop and solidify its relationships with customers and potential customers.

12.     One of the significant markets in which EMC competes is the enterprise storage market.  Enterprise storage refers to the market for computer data storage designed for large-scale high-technology environments.  EMC and Pure Storage – Tanner's current employer – are direct competitors in the enterprise storage market.  Pure Storage's website has numerous references identifying EMC as Pure Storage's "primary competitor" in the enterprise storage marketplace, including numerous statements from Pure Storage's CEO describing EMC as a direct competitor.

13.     The enterprise storage market is highly competitive, particularly with respect to pricing, which significantly impacts the development and sustainability of customer relationships.  The unique sales process for enterprise storage solutions requires that pricing and terms be negotiated on a customer-by-customer basis.  As a consequence of their employment with EMC, sales representatives develop strong relationships with customers, on behalf of EMC, and must develop creative custom solutions and pricing strategies tailored for each individual customer.  EMC's solutions often include ongoing consultation, maintenance, and support services.

14.     EMC devotes substantial resources to establishing and maintaining goodwill with its enterprise storage customers.  EMC has made significant investments in developing client relationships and goodwill among its customers by supporting the activities of EMC's sales force and by making expenditures on sales training, trade shows and education.  Long before hiring Tanner, EMC had established a leading reputation in the enterprise storage market and had developed critically valuable relationships with its customers with whom Tanner later worked.

*Tanner's Key Employee Agreement with EMC*

15.     Tanner was employed by EMC as a commercial sales representative from February 16, 2004 until December 21, 2012.  During his final years at EMC, Tanner was one of EMC's top commercial sales representatives, consistently ranking among the very top sales representatives in his region and among the top producers nationwide.  Tanner was also a "President's Club" recipient during each of his final years at EMC. The "President's Club" is an honor awarded to EMC's top producers.  In his final four years at EMC alone, EMC paid Tanner in excess of $1 million.

16.     During his tenure with EMC, Tanner was responsible for selling to several of EMC's key strategic enterprise accounts.  As a commercial sales representative, Tanner was entrusted with competitively sensitive business information developed and used by EMC, including confidential business plans, customer and partner lists, marketing strategies, product development plans, product offerings, pricing structures, solicitation methods, sales strategies and other confidential and proprietary information that would be valuable to an EMC competitor such as Pure Storage. Tanner also acquired knowledge of ongoing and potential customer relationships and the key decision makers within those organizations, such as Chief Information Officers, Directors of Infrastructure and Purchasing Managers.   EMC devotes significant resources towards developing and maintaining the secrecy of this information because it is a primary reason for EMC's success and its goodwill in the marketplace, including the goodwill it has earned from its customer relationships.

17.     To protect EMC's body of patentable, trade secret, and Confidential Information, and to protect its valuable customer relationships, EMC requires employees such as Tanner to enter into KEAs at the commencement of their employment with EMC.  A true and accurate executed copy of Tanner's KEA with EMC is attached hereto as Exhibit A.

18.    The KEA was entered into as (a) a condition of, and in consideration for, Tanner's employment with EMC, and (b) "[i]n view of the highly competitive nature of the business of [EMC], the need of [EMC] to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade secrets and/or confidential and proprietary information in conjunction with [Tanner's] employment with [EMC]." Ex. A, pp. 1-2.

19.    By executing his KEA with EMC, Tanner agreed, among other things, to the following one-year non-solicitation provision:

> **Non-Solicitation**.  During your employment and for the twelve month period following the effective date of your termination, for any reason, from [EMC], you agree that you will not, either on your own behalf or on behalf of any person or entity, directly or indirectly: . . . (ii) solicit or divert, or attempt to solicit or divert, the business of any person or entity that is either a customer or a potential customer of [EMC] about which you had knowledge during your employment.

Ex. A, ¶ 5.

20.    Tanner's KEA also contains provisions that require him, among other things, not to use, divulge or disclose to persons outside of EMC any Confidential Information, and to keep all non-public EMC materials and information confidential:

> **Confidentiality of Company Materials**.  You agree that both during your employment with [EMC] and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it, any information not already lawfully available to the public concerning [EMC] or any of its customers or suppliers ("Confidential Information"), including but not limited to any products, product development, business strategy, financial information or customer, supplier or employee lists.  Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing,

financial, or sales order; and the present or future business or products of [EMC].

Ex. A, ¶ 3.

21.     By executing his KEA with EMC, Tanner also expressly acknowledged that information about EMC's customers and vendors was confidential, and he agreed not to use or disclose it:

> **Customer and Vendor Confidentiality**.  You recognize that it is essential to [EMC's] success that all customer and vendor information be deemed to be confidential and be properly treated as a confidential trade secret.  Therefore, you agree not to use or disclose any such customer or vendor information except as may be necessary in the normal conduct of [EMC's] business for the specific customer or vendor, and after the end of your employment with [EMC], you will return all such materials to the Company.

Ex. A, ¶ 2.

22.     By signing his KEA, Tanner agreed that (a) "the terms of [the KEA] are reasonable and properly required for the adequate protection of [EMC's] legitimate business interests," and (b) "any breach of [the KEA] will cause immediate and irreparable harm to [EMC] not compensable by monetary damages and that [EMC] will be entitled to obtain injunctive relief . . . to enforce the terms of [the KEA], without having to prove or show any actual damage to [EMC]. Ex. A, ¶¶ 7(c) and (d).

23.     At the time that the KEA was provided to Tanner for his review and execution in Massachusetts, EMC sent the KEA from Massachusetts along with a cover letter from EMC's President and Chief Executive Officer, Joseph M. Tucci, stating, among other things:

> In consideration of your employment by EMC and in recognition of the fact that as an employee of EMC you have access to confidential information, I ask that you please review and sign the following Key Employee Agreement (the "Agreement").  This Agreement protects both the Company and its employees from unfair competition from former employees.  This Agreement, when

signed by you, is a binding legal agreement, so you may wish to review its terms with your legal advisor before signing it.

*** 

If you have any questions, either your supervisor or your human resources representative would be happy to discuss them with you. Please keep one copy of the Agreement and Policies for your records.

Ex. A, p. 1.

24.     As a result of the cover letter from Mr. Tucci, Tanner was advised of (a) the legal significance of signing the KEA, (b) the opportunity to consult with a lawyer regarding the terms of the KEA, and (c) the opportunity to consult an EMC supervisor or human resources representative about the terms of the KEA.

25.     The KEA put Tanner on notice that (a) EMC could commence a court action against him in Massachusetts seeking injunctive and declaratory relief for violation of the KEA, (b) the appropriate venue for such action is "in the state and/or federal courts located in Massachusetts," and (c) the KEA "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law." Ex. A, ¶¶ 7(h) and (j).

26.     Tanner expressly agreed to "consent to personal jurisdiction . . . in the state and/or federal courts located in Massachusetts." *Id.*, ¶ 7(h).

27.     The last page of Tanner's KEA bears the address of EMC's headquarters located in Hopkinton, Massachusetts.

28.     Tanner has strong ties to Massachusetts. He began his career at EMC as an inside sales representatives based in Massachusetts. During his tenure with EMC, Tanner personally visited Massachusetts for business purposes on numerous occasions. For instance, in 2005 he spent approximately one week in Massachusetts attending an EMC training session called "New

8

Hire Training – EMC Commercial," at which Tanner received extensive training regarding, among other things, EMC's products, services, and pricing and sales methodologies. Tanner attended at least three other instructor-led training sessions in Massachusetts. In addition, he traveled to Massachusetts to meet with and entertain clients and to attend "executive briefing" sessions. EMC hosts customers at "executive briefings" at its headquarters in Hopkinton, Massachusetts (or elsewhere), wherein EMC sales employees (including Tanner) travel together with EMC's customers for the purpose of discussing EMC's newest technology offerings and developing deeper and more profitable customer relationships. Tanner also regularly communicated with Massachusetts-based EMC employees (including employees at the "Pricing Desk") via email and telephone. Tanner was required to work with the Pricing Desk in order to close sales transactions with EMC customers. Finally, Tanner was issued EMC stock.

### *Tanner's Unlawful Solicitation of EMC Customers on Behalf of Pure Storage in Violation of his KEA*

29.     Tanner's last day at EMC was December 21, 2012. At the time of Tanner's departure, EMC was unaware of even a single instance where EMC had competed against Pure Storage for any enterprise storage sale in Tanner's region. Indeed, as of the date of Tanner's departure, Tanner's District Manager was generally unfamiliar with Pure Storage. Almost immediately following Tanner's resignation, Pure Storage began competing directly with EMC for numerous Chicago-area enterprise storage accounts – including accounts which were assigned directly to Tanner during his employment with EMC. EMC also learned that Tanner joined Pure Storage and became responsible for selling Pure Storage's directly competing products to the same class of customers that he sold to while at EMC. Moreover, EMC is informed that Tanner is one of only two Pure Storage sales representatives assigned to the

9

Chicago region and to a few surrounding states. EMC is now competing against Pure Storage in several EMC customer accounts that Tanner was responsible for selling to while at EMC.

30.     EMC has learned that Tanner is unlawfully soliciting at least two EMC customers that he personally sold EMC products to as an EMC employee. Each customer is a longtime customer of EMC. These companies were customers of EMC long before Tanner was assigned to cover these accounts.

31.     EMC has confirmed that Tanner directly solicited one of these EMC customers -- a large global law firm with an office in Chicago – on behalf of Pure Storage. During his tenure with EMC, Tanner was assigned to, and did, sell EMC products to this law firm. In fact, in September 2010, he attended an executive briefing with the customer on EMC's behalf in Santa Clara, California. Both the technical team at this law firm and one of EMC's partners confirmed that Tanner solicited this law firm for the express purpose of selling Pure Storage products.

32.     EMC has further confirmed that Tanner has contacted at least one other EMC customer he previously sold EMC products to as an EMC employee. On May 8, 2013, while attending a sales conference called "EMC World" in Las Vegas, Nevada, an EMC systems engineer met with the Director of Infrastructure for a large privately-held global financial services firm (and EMC customer) headquartered in Chicago and New York. The systems engineer worked closely with Tanner during Tanner's final years at EMC, including in customizing and selling EMC products to this same financial services firm. Tanner had also attended an executive briefing with this global financial services firm in Santa Clara, California in September 2011.

33.     During the May 8, 2013 meeting with the customer, the EMC systems engineer observed a recent email that had been sent by Tanner (at Pure Storage) to the Director of

Infrastructure, who confirmed that Tanner had contacted him on behalf of Pure Storage. The Director of Infrastructure also confirmed that Pure Storage had contacted the New York-based Purchasing Manager of this EMC customer, with whom Tanner had a direct relationship as a result of his employment with EMC.

34.     In addition, on information and belief, Tanner is soliciting various additional EMC customers in violation of his KEA, including (1) a financial technology and trading firm with a US office located in Chicago, and (2) another Chicago-based company that provides portfolio, practice management and reporting solutions to financial advisors and institutions. Each of these customers is a long-time EMC customer that purchased EMC products from Tanner while he was still employed by EMC. Indeed, Tanner attended executive briefings with each of the customers in July 2010 (at EMC Headquarters in Hopkinton, Massachusetts) and November 2011 (in Santa Clara, California). EMC is now competing against Pure Storage for the sale of products and services to these two EMC customers. As discussed above, Tanner is said to be one of only two Pure Storage sales representatives in this region.

35.     On information and belief, Tanner, on behalf of himself and Pure Storage has also used, and continues to use, EMC Confidential Information in order to solicit business from EMC customers and to compete against EMC, including knowledge of ongoing and potential customer relationships, and knowledge of EMC's product technologies, capabilities and architecture, and its unique business processes, methods, and pricing methodologies and strategies. For example, while at EMC Tanner obtained Confidential Information about each of the four EMC customers discussed above, including information about the architecture and operations of each of these company's enterprise storage requirements, the architecture that EMC was proposing to sell to these customers and EMC's sales and pricing strategies related to these customers. Upon

11

information and belief, Tanner used this information and his specialized knowledge of the particular characteristics and performance of EMC's products, to solicit these companies and to compete unfairly against EMC in an effort to win business on behalf of Pure Storage at the expense of EMC.

36.     EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its trade secrets and Confidential Information, including but not limited to, requiring its employees to sign KEAs, requiring its customers, partners and vendors to sign non-disclosure agreements, password protecting its computer systems and employing physical security measures at all of its facilities. Moreover, EMC adopts and enforces several written policies that are designed to protect its Confidential Information and trade secrets, including following the concept of "least privilege," pursuant to which employees are only provided the minimum access needed to perform their assigned duties.

37.     But for his employment with EMC, Tanner would not have acquired, or gained access to, EMC'S Confidential Information.  A competitor of EMC – such as Pure Storage – could use such information to great advantage, by efficiently targeting companies and using EMC's own Confidential Information to compete against EMC to win business in a manner that would otherwise require months or years of investment and effort.

38.     Tanner's unlawful solicitation of EMC customers is part of a larger campaign by several former EMC employees, each now employed by Pure Storage, to compete unfairly with EMC by, among other things, raiding EMC of its valuable employees and misappropriating EMC Confidential Information and property in an effort to increase Pure Storage's presence in the marketplace at the expense of EMC.  Since last year, no less than eleven employees have departed EMC under suspicious circumstances to join Pure Storage.  EMC has been forced to

initiate litigation in this court seeking declaratory relief and preliminary and permanent injunctive relief to enjoin its former employees from continuing to possess EMC property, from using or disseminating EMC property or Confidential Information, and from unlawfully soliciting EMC employees to leave EMC – all in violation of their KEAs with EMC. *See EMC Corporation v. Cruey et al.*, Suffolk Superior Court, Civil Action No. 13-0843-C. On May 13, 2013, the court granted a Preliminary Injunction against certain of the defendants, ordering them to return certain EMC property to EMC.

39.     On March 8, 2013, EMC's counsel sent letters to Pure Storage and to several of its former employees who are now employed by Pure Storage (including Tanner) for the purpose of notifying each person of the litigation and reminding them that their KEAs with EMC remain in full force and effect even after the termination of their employment. Notwithstanding EMC's letters, the unlawful campaign against EMC continues, including Tanner's solicitation of EMC customers in blatant disregard of his obligations under the KEA.   This is among the precise conduct that the KEA is intended to prevent in order to protect EMC's legitimate business interests, including its confidential information, customer relationships and the goodwill it has earned in the enterprise storage marketplace.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Pursuant to M.G.L. c. 231A §§ 1 and 2 for Breach of the KEA)

40.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

41.     As described above, and further set forth below, Tanner breached his KEA.

42.     As a result of Tanner's breaches and unlawful conduct, EMC has suffered and will continue to suffer irreparable harm.

13

43.     An actual, substantial, justiciable and continuing controversy exists between EMC and Tanner concerning his breaches and unlawful conduct.

44.     Accordingly, EMC seeks a judgment pursuant to M.G.L. c. 231A, §§ 1-2, that Tanner has breached one or more provisions of his KEA.

45.     The KEA is a valid and binding written agreement between EMC and Tanner.

46.     Tanner's KEA was made for valid consideration.

47.     EMC performed its contractual duties under Tanner's KEA.

48.     Tanner's KEA is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including EMC's confidential information and goodwill in the enterprise storage market.

49.     As a result of the conduct described above, Tanner breached his KEA by, directly or indirectly, soliciting, diverting and/or attempting to solicit or divert the business of EMC's customers and/or potential customers about which he had knowledge during his employment with EMC.

50.     EMC has suffered and will continue to suffer irreparable harm as a result of Tanner's conduct.

### SECOND CAUSE OF ACTION

### (Injunctive Relief)

51.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

52.     EMC has a reasonable likelihood of succeeding on the merits of its claim for declaratory relief based on standard principles of contract interpretation, and the facts already developed and sworn to in this Verified Complaint.

14

53.    If Tanner continues to unlawfully solicit EMC customers and prospective customers, EMC will suffer irreparable injury.  By contrast, if Tanner is enjoined from violating the non-solicitation provision of his KEA while this Court determines the rights of the parties, Tanner will suffer no such injury.

54.    This Court should enjoin Tanner from violating the non-solicitation provision of his KEA during the pendency of this action.

### Prayers For Relief

WHEREFORE, Plaintiff EMC Corporation respectfully requests that this Court:

(i)    Issue an order of notice for a hearing on EMC's request for a preliminary injunction under prayer (ii) below;

(ii)    After a hearing, preliminarily enjoin Tanner from, directly or indirectly, soliciting, diverting and/or attempting to solicit or divert the business of EMC's customers and/or potential customers about which he had knowledge during his employment with EMC;

(iii)    After further proceedings, enter judgment declaring that Tanner has violated his KEA with EMC; and

(iv)    Enter such other or further equitable relief as it deems just and proper.

15

Respectfully Submitted,


CHOATE HALL & STEWART LLP

Paul D. Popeo (BBO No. 567727)
G. Mark Edgarton (BBO No. 657593)
Anita M.C. Spieth (BBO No. 676302)
Two International Place
Boston, Massachusetts  02110
Tele: (617) 248-5000
Fax: (617) 248-4000
ppopeo@choate.com
medgarton@choate.com
aspieth@choate.com

Dated:  June 4, 2013                                *Counsel for Plaintiff EMC Corporation*


*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Patricia J. Hill (BBO No. 554834)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tele: (508) 435-1000

16

**VERIFICATION**

I, Josh Weisfuse, District Manager at EMC Corporation, hereby state under oath that I have read the foregoing Verified Complaint, and that the facts contained therein are true and correct to the best of my knowledge, information and belief, unless otherwise indicated in the Verified Complaint.

Signed under the penalties of perjury this 3 th day of June, 2013.

_____
Josh Weisfuse

5769776v1

# EXHIBIT A

## KEY EMPLOYEE AGREEMENT



## *Dear Employee:*

We at EMC fully recognize that our success and achievement as a company depend on your contributions. An important goal of EMC is to establish a working environment which will allow you to find maximum job satisfaction while participating in our highly competitive, technological and exciting business.

The activities of EMC's employees result in a body of patentable, trade secret and confidential information which helps keep EMC on the leading edge of technology in our industry. This information benefits us all, since EMC depends on it for its continued growth and success, and its proper use and protection should be of paramount concern to us all.

In consideration of your employment by EMC and in recognition of the fact that as an employee of EMC you have access to confidential information, I ask that you please review and sign the following Key Employee Agreement (the "Agreement"). This Agreement protects both the Company and its employees from unfair competition from former employees. This Agreement, when signed by you, is a binding legal agreement, so you may wish to review its terms with your legal advisor before signing it.

Because of your access to EMC confidential information, enclosed for your review and signature is EMC's policy on insider trading, which sets forth your obligations as an EMC employee with regard to the purchase and sale of EMC securities. Also, because of EMC's commitment to maintaining an environment free from harassment, enclosed for your review and signature is EMC's policy against harassment.

If you have any questions, either your supervisor or your human resources representative would be happy to discuss them with you. Please keep one copy of the Agreement and Policies for your records.

My sincere thanks for your cooperation.

Joseph M. Tucci
President and Chief Executive Officer

**EMC²**

# KEY EMPLOYEE AGREEMENT

J..W TANNER

Employee Name
(please print)

In view of the highly competitive nature of the business of EMC Corporation (together with its subsidiaries, the "Company"), the need of the Company to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade secrets and/or confidential and proprietary information in conjunction with your employment with the Company, you agree as follows:

## 1. Non-Competition.

(a) For as long as you are employed by the Company, you shall devote your full time and efforts to the Company and shall not participate, directly or indirectly, in any capacity, in any business or activity that is in competition with the Company.

(b) For the twelve month period following the effective date of your termination, for any reason, from the Company, you agree not to directly or indirectly compete with the Company. For purposes of this Agreement, such competition shall include but not be limited to: (i) the provision of any services, whether as an employee, consultant, independent contractor, member of a board of directors, or in any other capacity, to any entity that is developing, producing, marketing, soliciting or selling products or services competitive with products or services being developed, produced, marketed or sold by the Company as of the effective date of your termination; and (ii) any ownership interest of greater than 1% (whether directly or indirectly or by way of stock options (vested or unvested) or otherwise) in any such entity. This section 1(b) shall apply to you only if, as of the effective date of your termination, you are in a position at the Company that is at the director level or higher. For purposes of this Agreement, "director level" includes all individuals at the Company that report directly to a vice president and/or that are identified on the Company's systems as director level.

## 2. Customer and Vendor Confidentiality.

You recognize that it is essential to the Company's success that all customer and vendor information be deemed to be confidential and be properly treated as a confidential trade secret. Therefore, you agree not to use or disclose any such customer or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer or vendor, and after the end of your employment with the Company, you will return all such materials to the Company.

## 3. Confidentiality of Company Materials.

You agree that both during your employment with the Company and thereafter you will not use for your own benefit, divulge or disclose to anyone except to persons within the Company whose positions require them to know it, any information not already lawfully available to the public concerning the Company or any of its customers or suppliers ("Confidential Information"), including but not limited to any products, product development, business strategy, financial information or customer, supplier or employee lists. Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial or sales order; and the present or future business or products of the Company.

## 4. All Developments the Property of the Company.

All confidential, proprietary or other trade secret information and all other discoveries, inventions, processes, methods and improvements, conceived, developed, or otherwise made by you, alone or with others, and in any way relating to the Company's present or planned business or products, whether or not patentable or subject to copyright protection and whether or not reduced to tangible form or reduced to practice during the period of your employment with the Company ("Developments") shall be the sole property of the Company. You agree to disclose all Developments promptly, fully and in writing to the Company promptly after development of the same, and at any time upon request. You agree to, and hereby do assign to the Company all your right, title and interest throughout the world in and to all Developments. You agree that all Developments shall constitute "Works for Hire" (as such are defined under the U.S. Copyright Laws) and hereby assign to the Company all copyrights, patents and other proprietary rights you may have in any Developments without any obligation on the part of the Company to pay royalties or any other consideration to you in respect of such Developments. You agree to assist the Company (without charge, but at no cost to you) to obtain and maintain for itself such rights.

## 5. Non-Solicitation.

During your employment and for the twelve month period following the effective date of your termination, for any reason, from the Company, you agree that you will not, either on your own behalf or on behalf of any person or entity, directly or indirectly: (i) recruit, solicit or induce, or attempt to recruit, solicit or induce any person who is an employee, consultant or independent contractor of the Company to terminate, alter or modify such person's employment relationship with the Company; or (ii) solicit or divert, or attempt to solicit or divert, the business of any person or entity that is either a customer or a potential customer of the Company about which you had knowledge during your employment.

## 6. Return of Company Materials.

At the time of your termination, for any reason, from the Company, you agree to return to the Company all Company materials, which include but are not limited to all documents in any tangible or electronic form and all property, in your possession or control relating to work done for the Company or relating to the processes and materials of the Company, as well as all materials concerning past, present and future or potential clients, customers, products and/or services. Such materials include, but are not limited to, customer and/or vendor lists, customer and/or vendor prospect material, financial projections, price lists, rate structures, all technical materials, presentation materials, and software owned or developed by the Company for any purpose, in any form. You also agree to return to the Company all materials provided by customers of the Company and all teaching materials provided by the Company. You also agree to attend an exit interview if so requested by the Company, and to sign an acknowledgment of your obligations under this Agreement.



### 7. Miscellaneous:

(a) This Agreement contains the entire agreement between you and the Company with respect to the subject matter hereof, superseding any previous oral or written agreements with the Company or any officer or representative thereof. In the event of any inconsistency between this Agreement and any other contract between you and the Company, the provisions of this Agreement shall prevail.

(b) Your obligations under this Agreement shall survive the termination of your employment with the Company regardless of the manner of or reasons for such termination, and regardless of whether such termination constitutes a breach of any other agreement you may have with the Company. Your obligations under this Agreement shall be binding upon your heirs, assigns, executors, administrators and representatives, and the provisions of this Agreement shall inure to the benefit of and be binding on the successors and assigns of the Company.

(c) You agree that the terms of this Agreement are reasonable and properly required for the adequate protection of the Company's legitimate business interests. You agree that in the event that any of the provisions of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law, rule, or policy or for any reason unenforceable as written, then such court may modify any of such provisions so as to permit enforcement thereof to the maximum extent permissible as thus modified. Further, you agree that any finding by a court of competent jurisdiction that any provision of this Agreement is contrary to any applicable statute, law, rule or policy or for any reason unenforceable as written shall have no effect upon any other provisions and all other provisions shall remain in full force and effect.

(d) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Company not compensable by monetary damages and that the Company will be entitled to obtain injunctive relief, in addition to all other relief in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damage to the Company.

(e) No failure by the Company to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission by the Company in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(f) You acknowledge that you have received and reviewed the attached Harassment and Insider Trading policies, and that you will abide by such policies and all other Company policies that are issued and amended from time to time by the Company in its discretion.

(g) You agree that this Agreement may be amended or modified only by written agreement of yourself and either the President and Chief Executive Officer or the General Counsel.

(h) You agree that if the Company commences an action against you, by way of claim or counterclaim and including declaratory claims, in which it is preliminarily or finally determined that you have violated any provision of this Agreement, you will reimburse the Company for all its costs, expenses and reasonable attorneys' fees incurred in such action. You agree that the appropriate venue for such action is in the state and/or federal courts located in Massachusetts, and you consent to personal jurisdiction in such courts.

(i) You agree that tuition costs for which the Company has reimbursed you and tuition advancements which may have already been paid to you will be recovered in full if you voluntarily terminate employment within one year of completion of the respective course(s).

(j) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law. This Agreement is executed under seal.

(k) You agree that the Company and its assigns may use your name, your photograph and other reproductions of you during or after your employment in connection with the Company's business. You acknowledge that the Company will maintain data, including in an electronic form, relating to your employment and you agree that such data may be transferred, including across state and country borders, to any Company location for the Company's business use.

(l) This Agreement does not create any obligation on the Company or any other person or entity to continue your employment. Your employment is at will, meaning either the Company or you may terminate your employment at any time and for any reason or no reason at all.

### 8. *Arbitration.* *You agree that, to the extent permitted by law, binding arbitration shall be the sole and exclusive remedy for resolving any legal dispute arising out of or relating to your employment by the Company, including but not limited to all claims relating to your compensation, the termination of your employment, all claims of discrimination, including under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Older Workers Benefits Protection Act, and all other local, state or federal discrimination or civil rights laws, all claims for severance, for reinstatement, attorneys' fees or costs, and any other employment-related legal claim; provided, however, that this shall in no way limit the Company's ability to commence litigation with regard to any breach of this Agreement. Any such arbitration shall be conducted pursuant to the Company's arbitration policy, as amended from time to time, including but not limited to procedures regarding selection of arbitrators and apportionment of the arbitrator's fees. You will be responsible for all of your own costs and expenses in connection with any such arbitration.*

EMC CORPORATION

By: _____

Its: _____

AGREED AND ACCEPTED:

Signature _____

Name (Printed) _____ JON TANNER _____

Date _____ 2-3-04 _____

Revised - 1/1/02

# INSIDER TRADING POLICY

During your work at EMC or its subsidiaries (collectively, "EMC"), you may obtain information about EMC and its customers, suppliers or others with whom EMC has an existing or potential business relationship. This information may not yet be generally known to the public and is called "inside information." This information may affect the price of the company's stock. Trading on this information is a serious offense, punishable by civil and criminal penalties.

Insider trading laws are Federal laws with which we all must comply. To maintain the highest legal and ethical standards and to avoid even the appearance of improper conduct, EMC has adopted the following policy. Every employee MUST follow this policy to protect your interests and EMC's interests.

## POLICY

If any employee is in the possession of material non-public information regarding EMC, neither that employee nor any related person may buy or sell EMC securities or engage in any other action to take advantage of, or pass on to others, that information. This policy also applies to material non-public information relating to any other company, including EMC's customers or suppliers, obtained in the course of your employment.

*AT NO TIME MAY AN EMPLOYEE OR ANY RELATED PERSON ENGAGE IN SHORT SALES OF EMC SECURITIES OR TRADE IN OPTIONS CONTRACTS OF ANY KIND INVOLVING EMC SECURITIES.*

## DISCUSSION

"Material Information" is any information that a reasonable investor would consider important in deciding to buy, hold or sell a stock and thus that could reasonably affect the price of the stock.

Examples of material information are: projections of earnings or losses; a proposed merger or acquisition; a significant sale of assets or of a subsidiary; changes in dividend policies, a stock split or the offering of additional securities; changes in management; significant new projects; financial liquidity problems; and the gain or loss of a substantial customer or supplier. Either positive or negative information may be material.

When Information is Public. Information is public only when it has been released by a press release or a filing with the Securities and Exchange Commission ("SEC") and enough time has passed to permit the market to receive and act on that information. It is EMC's policy that as a general rule, you should not engage in any transactions until one full trading day has passed after the release of information.

If you are in doubt about whether or not you are in the possession of material non-public information, you should not trade.

Transactions by Family Members. The same restrictions apply to your family members and others living in your household.

Tipping Information to Others. In addition, you must not "tip" or pass on material non-public information to others. Penalties apply whether or not you profit from such tipping.

## PENALTIES

For individuals who trade on inside information or tip others, there are civil penalties, including the return of any profit gain or loss avoided and penalties of up to three times this amount and criminal penalties, including imprisonment. In addition, violation of this policy can result in termination of your employment.

Insider trading, in the U.S. and abroad, is vigorously prosecut. Trading is detected through sophisticated methods used by th SEC and the stock exchanges. The U.S. has agreements with virtually all countries with stock exchanges, providing for reciprocal enforcement.

This policy does not apply to the exercise of vested stock optic made in accordance with EMC's Stock Option Plans. Howeve the above policy is to be observed with a sale of exercised optic shares.

This policy applies to transactions in the EMC Stock Fund in the EMC 401(k) Plan. This means that while you are in the possession of material non-public information, you may maint your existing contribution rate to the Stock Fund but you may not engage in any transaction in the Stock Fund such as increas or decreasing your contribution rate or moving funds out of th Stock Fund.

"EMC securities" includes EMC Common Stock, $.01 par val and any other equity or debt security issued by EMC from tim to time.

You are responsible for compliance with this policy and it is therefore imperative that you fully understand this policy and the insider trading laws. If you have any questions about a specific transaction or about this policy, please contact the Office of the General Counsel.

EMC²

## ANTI-HARASSMENT POLICY

### PURPOSE
It is the goal of EMC to promote a workplace that is free of sexual harassment, and any other type of discriminatory harassment.

### SCOPE
This policy applies to EMC employees in all work-related settings and activities, whether inside or outside the workplace, and includes business trips and business-related social events. This also applies to the conduct of an EMC employee towards a customer, supplier and contractor.

### POLICY
The Company will not tolerate sexual or other types of harassment, and will take all steps necessary to prevent its occurrence. While this policy sets forth EMC's goals of promoting a workplace that is free from harassment, the policy is not designed or intended to limit EMC's authority to discipline or take remedial action for workplace conduct which EMC deems unacceptable, regardless of whether that conduct satisfies the definition of Harassment.

### PROHIBITION OF SEXUAL HARASSMENT
The Company's policy against sexual harassment prohibits sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when: 1. submission to or rejection of such conduct is an explicit or implicit term or condition of employment, 2. the employee's submission to or rejection of such conduct is used as the basis for employment decisions affecting such individual, or 3. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, humiliating or offensive working environment.

While it is not possible to list all those circum-stances that may constitute sexual harassment, the following are some examples of conduct which, if unwelcome, may constitute sexual harassment depending upon the totality of the circumstances including the severity of the conduct and its pervasiveness: • unwelcome sexual advances, whether they involve physical touching or not; • sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life; comments about an individual's body, sexual activity, deficiencies, or prowess; • displaying sexually suggestive objects, pictures, or cartoons, including by downloading such materials from the Internet; • unwelcome leering, whistling, brushing against the body, sexual gestures, or suggestive or insulting comments; • inquiries into one's sexual experiences; and • discussion of one's sexual activities.

### PROHIBITION OF OTHER TYPES OF DISCRIMINATORY HARASSMENT
The Company's policy also prohibits verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion, sexual orientation, age, national origin, disability, or other protected classi-fication, and that: 1. has the purpose or effect of creating an intimidating, hostile, humiliating or offensive working environment, 2. has the purpose or effect of unreasonably interfering with an individ-ual's work performance, or 3. otherwise adversely affects an individual's employment opportunities.

While it is not possible to list all those circumstances that may constitute discriminatory harassment, the following are some examples of conduct which may constitute discriminatory harassment depending upon the totality of the circumstances including the severity of the conduct and its pervasiveness: • epithets, slurs, negative stereotyping, or jokes, or threatening, intimidating or hostile acts that relate to race or other protected classification; • written or graphic material that denigrates or shows hostility toward an individual or group because of race or other protected classification and that is circulated in the workplace, or placed anywhere in the Company's premises such as on an employee's desk, workspace or on Company computer, email or voicemail.

### COMPLAINT PROCEDURE
Complaints of either sexual or other discriminatory harassment must be brought immediately to the attention of the applicable Human Resources Operations Manager ("HR Ops Manager"). A list-ing of HR Ops Managers is contained on Channel EMC. Alternatively, you may contact the Office of the General Counsel at (508) 435-1000, extension 77267. Although reports of sexual or discriminatory harassment may be made verbally, employees are strongly encouraged to make any such reports in writing. Written reports of harassment assist the investigation process.

When a complaint is received, the Human Resources Operations Manager, in conjunction with the Office of the General Counsel, will promptly investigate the allegation as discreetly and confidentially as possible. The investigation will normally include a private interview with the person filing the complaint and with witnesses, as appropriate. The investigation will also normally include an interview of the person alleged to have committed the harassment. When the investigation is complete, the Human Resources Operations Manager or the Office of the General Counsel will, to the extent appropriate, inform the person filing the complaint and the person alleged to have com-mitted the conduct of the results of the investigation.

If the Company determines that a violation of this policy has occurred, it will take such disciplinary action as it deems appropriate, including but not limited to counseling, warnings, transfers, suspen-sions, and employment termination. Moreover, the Company can and will take the disciplinary action it deems appropriate if it determines that conduct which does not meet the definitions in this policy nevertheless is unprofessional, inappropriate or otherwise warrants discipline.

### RETALIATION
Retaliation against an employee who has complained about sexual or other discriminatory harassment, or against an individual who has cooperated with an investigation of such harassment is strictly prohibited and will not be tolerated by EMC.

### DISCIPLINARY ACTION
If it is determined that inappropriate conduct has been committed by one of EMC's employees, the Company will take appropriate corrective action under the circumstances. Such action may range from counseling to termination of employment, and may include such other forms of disciplinary action as EMC deems appropriate under the circumstances.

Revised - 1/1/02

EMC²

**R I D E R**   (USE THE FOLLOWING ONLY IF APPLICABLE)

## SALES TRAINING REIMBURSEMENT

You agree to reimburse the Company the costs of training if you choose to leave the Company's employ within the first two years of employment. If you voluntarily terminate employment within the first twelve months, you will be responsible for reimbursing the Company the total training costs of $6,000. If you voluntarily terminate employment during the period of the thirteenth month to the twenty-fourth month, you will be responsible for a $3,000 reimbursement. If you are involuntarily terminated by the Company, this paragraph on training reimbursement would not apply. This training reimbursement paragraph would not apply in cases of severe personal hardship causing voluntary termination of an employee.

_____ 2-3-04

Initials/Date

## RELOCATION OR IMMIGRATION REIMBURSEMENT

You agree to reimburse the Company the costs of any relocation or immigration fees if you choose to leave the Company's employ within the first two years of employment. If you voluntarily terminate employment within the first year, you will be responsible for the reimbursement of the total costs. If you voluntarily terminate employment during the period of the thirteenth month to the twenty-fourth month, you will be responsible for one-half of the total costs. Immigration payback period begins on the effective approval date of the visa petition. If you are involuntarily terminated by the Company, this paragraph would not apply.

_____

Initials/Date

## CUSTOMER SERVICE TRAINING REIMBURSEMENT

You agree to reimburse the Company the costs of training if you choose to leave the Company's employ within the first two years of employment. If you voluntarily terminate employment within the first twelve months, you will be responsible for reimbursing the Company the total training costs of $6,000. If you voluntarily terminate employment during the period of the thirteenth month to the twenty-fourth month, you will be responsible for a $4,000 reimbursement. If you are involuntarily terminated by the Company, this paragraph on training reimbursement would not apply. This training reimbursement paragraph would not apply in cases of severe personal hardship causing voluntary termination of an employee.

_____

Initials/Date



## EMC²

### where information lives

EMC Corporation, Hopkinton, MA 01748-9103

Revised - 1/1/02